## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **AVA FLOYD,** *pro se*, | * | |
| | * | |
| Plaintiff | * | |
| | * | **Civil No. PJM 14-1749** |
| v. | * | (consolidated with |
| | * | Civil No. PJM 14-1751) |
| | * | |
| **WASHINGTON SUBURBAN** | * | |
| **SANITARY COMMISSION,** *et al.*, | * | |
| | * | |
| Defendants. | * | |

### MEMORANDUM OPINION

Plaintiff Ava Floyd ("Floyd"), *pro se*, has sued Defendants Washington Suburban Sanitary Commission ("WSSC") and Jerry N. Johnson ("Johnson") (collectively, "Defendants") as a result of the termination of her employment by WSSC and its failure to select her for an interview for a new position. Floyd originally filed two separate complaints against Defendants in state court, asserting: retaliation in violation of Title VII of the Civil Rights Act of 1964 against WSSC, wrongful termination against WSSC and Johnson, and race, sex, and national origin-based discrimination against WSSC. After Defendants removed both Complaints to this Court, the Court consolidated the actions. The Court considers Defendants' Motion for Summary Judgment as to all claims. ECF No. 56. For the following reasons, Defendants' Motion for Summary Judgment (ECF No. 56) is **GRANTED**.[1]

---

[1] Floyd has styled her response to Defendants' Motion as an "Opposition to Defendants' Motion for Summary Judgment," asserting that there are disputed issues of fact as to several of her claims and suggesting that the Court should allow her case to proceed to trial. *See* Plf.'s Resp. Opp'n, ECF No. 58. However, at the end of the Memorandum in support of her Motion, Floyd also appears to ask the Court to grant summary judgment in *her* favor with respect to her retaliation and wrongful termination claims. *See* Plf.'s Resp. Opp'n, Mem. Supp. 20, ECF No. 58-1. To the extent that Floyd is moving for summary judgment on those claims, the motion is **DENIED**.

1

# I.

Here are the undisputed facts.

## A.  The Washington Suburban Sanitary Commission (WSSC)

WSSC was created by the Maryland General Assembly "to provide public water and sewer service to the residents of Montgomery and Prince George's Counties within Maryland." *Bushek v. Washington Suburban Sanitary Comm'n*, 155 F. Supp. 2d 478, 481 (D. Md. 2001). It is one of the largest water and wastewater utilities in the United States. Defs.' Mot. Summ. J., Mem. Supp. 2, ECF No. 56-1. Johnson, an African-American male, is WSSC's General Manager and Chief Executive Officer. *Id.* 14 n.12.

WSSC maintains policies promoting equal employment opportunity[2] and opposing workplace harassment, retaliation, and other forms of employment discrimination.[3] Defs.' Mot. Summ. J., Ex. 1, ECF No. 56-2, and Ex. 2, ECF No. 56-3. WSSC has a procedure to enforce these policies, called its EEO, Harassment and Retaliation Internal Complaint Procedure. Defs.' Mot. Summ. J., Ex. 3, ECF No. 56-4.

## B.  Ava Floyd's WSSC Employment

Floyd, an African-American female, worked for WSSC between September 2007 and June 2013. Am.  Compl., Civ. No. PJM 14-1751 (hereinafter "Compl. II") at 2:3-5, ECF No. 4;

---

[2] As of March 2015, WSSC's workforce was 49% African-American, 41% Caucasian, 6% Asian, and 4% Hispanic, with its remaining employees either American Indian or Alaskan Native of persons identifying as mixed race. Defs.' Mot. Summ. J., Decl. Rhonda Exum ¶ 8, ECF No. 56-5. Twenty-eight percent of WSSC's employees were female. *Id.*

[3] Defendants attach a copy of WSSC's equal employment policy to their Motion. In her Response in Opposition, Floyd disputes the particular version of the equal employment policy in effect at the time of Floyd's employment, stating that the version attached to Defendants' Motion was not in effect until 2013, and that the applicable version for purposes of Floyd's claims was the policy attached as an exhibit to both of her Complaints. *See* Plf.'s Resp. Opp'n, Mem. Supp. 6; Compl., Civ. No. PJM 14-1749 (hereinafter "Compl. I"), Ex. 1, ECF No. 2-2; Am. Compl., Civ. No. PJM 14-1751 (hereinafter "Compl. II"), Ex. 2, ECF No. 2-2. The differences in these two versions of the policy are not material for purposes of summary judgment.

Defs.' Mot. Summ. J., Ex. 5, ECF No. 56-6, and Ex. 21; Defs.' Mot. Summ., Ex. 21, ECF No. 56-22. She was hired as a Business Technology Analyst III ("BTA") within WSSC's Engineering and Construction Group. Compl. II at 2:3-5; Defs.' Mot. Summ. J., Ex. 5.

While employed by WSSC, Floyd filed several discrimination claims, both internally and with the United States Equal Employment Opportunity Commission (EEOC).

On or about January 14, 2008,[4] Floyd filed a Charge of Discrimination against WSSC with the EEOC, alleging that she had been the subject of race and sex discrimination by Paul Coverstone ("Coverstone"),[5] then Acting Chief Information Officer for WSSC, and Jeffrey Golden ("Golden"),[6] an Application Development Division Manager at WSSC. Defs.' Mot. Summ. J., Ex. 6, ECF No. 56-7. On February 28, 2011, the EEOC informed Floyd that it was unable to conclude that her charge established a violation of the law, and issued her a right to sue letter. Defs.' Mot. Summ. J., Ex. 7, ECF No. 56-8.

On February 2, 2009 and February 12, 2009, Floyd filed three separate Internal Equal Employment Opportunity ("EEO") Complaints with WSSC's Office of Fair Practices ("FPO"). Defs.' Mot. Summ. J., Ex. 8, ECF No. 56-9. These complaints made various claims of discrimination based on gender, color, and race against Coverstone, Golden, and Sonla Shaw ("Shaw"),[7] a Division Manager. *Id.* On May 12, 2009, the FPO informed Floyd that it found her allegations to be unsupported. Defs.' Mot. Summ. J., Ex. 9, ECF No. 56-10.

---

[4] Floyd contends that this date in the EEOC Complaint is a typographical error, and that she did not in fact file an EEOC Complaint until January of 2009. *See* Floyd's Resp. Opp'n, Mem. Supp. 5. The actual date of the filing of the EEOC Complaint is not material for purposes of Defendants' Motion for Summary Judgment, as will be discussed in Part III.A., *infra*.
[5] Coverstone is a Caucasian male. Defs.' Mot. Summ. J., Mem. Supp. 9 n.8.
[6] Golden is a Caucasian male. Defs.' Mot. Summ. J., Mem. Supp. 9 n.9.
[7] Shaw is an Asian female. Defs.' Mot. Summ. J., Mem. Supp. 9 n.10.

### C. WSSC's "One IT" Plan of Reorganization

In September 2011, WSSC announced a "One IT" Plan of Reorganization, which was a consolidation and restructuring of all of its Information Technology ("IT") positions. Defs.' Mot. Summ. J., Ex. 10, ECF No. 56-11. This plan was to be implemented in several phases, during which all IT positions were either to be relocated to a new department or eliminated. *See id.* In a meeting that month, Johnson, Yvonne McKinney ("McKinney"), WSSC Human Resources Director, and Mujib Lodhi ("Lodhi"), WSSC IT Chief Information Officer, notified Floyd and other BTAs that their positions would be eliminated. Compl. II 12:4-5. All, Floyd included, were encouraged to apply for other IT positions within WSSC. *Id.* 13:15-16.[8]

On April 17, 2012, Floyd applied for the position of Senior Manager, Systems Acquisition and Process Engineering (hereinafter the "Senior Manager Position"). Defs.' Mot. Summ. J., Ex. 11, ECF No. 56-12. She did not apply for any other positions within WSSC. Defs.' Mot. Summ. J., Mem. Supp. 4. The Senior Manager Position involved several leadership responsibilities, including supervising a number of employees and managing system acquisition plans and processing.[9] Defs.' Mot. Summ. J., Ex. 12, ECF No. 56-13.

Ten persons applied for the Senior Manager Position, including Floyd: seven external to WSSC and three internal employees. Defs.' Mot. Summ. J., Ex. 13, ECF No. 56-14. In the hiring

---

[8] In her Response in Opposition, Floyd seems to take issue with Defendants' characterization of the "One IT" Plan of Reorganization. She notes that only the group of individuals in *Phase II* of the IT Reorganization were required to apply for other positions. She notes that her termination and the termination of other individuals in Phase II were deemed by WSSC to be "involuntary terminations." Plf.'s Resp. Opp'n, Mem. Supp. 4. She also emphasizes that not all IT positions were abolished. *Id.* 4-5, 9. These "disputes" of fact – if they can even be considered disputes – are not material for purposes of Defendants' Motion for Summary Judgment.

[9] Floyd asserts that the Senior Manager Position description attached to Defendants' Motion for Summary Judgment is not the posting WSSC provided to employees in 2012. Plf.'s Resp. Opp'n, Mem. Supp. 7. She points to an exhibit attached to one of her Complaints, which she asserts is the actual job posting she saw. *See* Compl. II, Ex. 4 at 26, ECF No. 2-4. Comparing the list of "Essential Functions" and "Minimum Education & Experience Requirements" between Defendants' and Floyd's exhibits, any difference in the postings is not material for purposes of summary judgment.

process, WSSC used a point system to evaluate each applicant's background, skills, and expertise (hereinafter the "Scoring Sheet"). *Id.* Applicants could earn points in each of the following categories: "BS [Bachelor of Science] degree" (up to 5 points); "10 yrs IT experience" (up to 5 points); "3 yrs Technology Mgt. [experience]" (up to 5 points); "Large-scale systems acquisitions [experience]" (up to 10 points); "BPR & Systems Requirements [experience]" (up to 10 points); "Enterprise systems/applications lifecycle [experience] "(up to 10 points); "MS [Masters] degree" (up to 5 points); Water/Wastewater Utility [experience] w/ operational systems" (up to 5 points); and "Oracle applications Suite [experience]" (up to 5 points). *Id.*

A panel of three WSSC employees (the "Interview Panel") evaluated the applications: Coverstone, Shaw, and Troy Wilkerson, an African-American male. Defs.' Mot. Summ. J., Ex. 19, ECF No. 56-20.

In total, Floyd earned 35 out of 65 possible points on the Scoring Sheet. Six of the nine applicants scored higher than she, one scored the same as she did, and one scored lower. Defs.' Mot. Summ. J., Ex. 13. Floyd's score suffered because she did not earn any points for two of the specialized technology experience categories: "Large-scale systems acquisitions [experience]," and "Enterprise systems/applications lifecycle [experience]." *Id.* The Comments by the Interview Panel with respect to Floyd's application specifically state: "Lack of experience on acquisition process and technology management experience." *Id.*

In or around July 2012, the Interview Panel designated for interview four out of the six applicants who scored higher than Floyd. Defs.' Mot. Summ. J., Ex. 14, ECF No. 56-15. Three out of the four interviewees were Caucasian and three were male. *Id.* Michael Price, an African-American male, was the highest-rated applicant after the interview, and WSSC ultimately hired

him for the Senior Manager Position on or about September 10, 2012. Defs.' Mot. Summ. J., Mem. Supp. 5.[10]

On October 3, 2012, Floyd sought to appeal the selection of the Senior Manager Position, Defs.' Mot. Summ. J., Ex. 16, ECF No. 56-17, but on October 19, 2012, WSSC denied the appeal, Defs.' Mot. Summ. J., Ex. 17, ECF No. 56-18.

On November 8, 2012, Floyd filed another internal EEO Complaint as a result of not being interviewed for the Senior Manager Position. Defs.' Mot. Summ. J., Ex. 18, ECF No. 56-19. The FPO found the EEO Complaint to be unsubstantiated. Defs.' Mot. Summ. J., Ex. 19, ECF No. 56-20.

On or about May 31, 2013, WSSC placed Floyd on administrative leave until June 29, 2013, when her position would be abolished pursuant to the "One IT" Plan of Reorganization. Defs.' Mot. Summ. J., Ex. 20, ECF No. 56-21. WSSC gave Floyd twelve weeks of severance pay until September 22, 2013. Defs.' Mot. Summ. J., Ex. 21, ECF No. 56-22.

After her position was abolished, Floyd filed another EEOC Complaint. On January 31, 2014, the EEOC informed her that it was unable to conclude that Floyd's charge established a violation of the law, and she was issued a right to sue letter. Compl. II, Ex. 4 at 25.

### D. Procedural History

On or about May 1, 2014, Floyd filed two separate complaints ("Complaint I" and "Complaint II") in the Circuit Court for Prince George's County related to her employment at

---

[10] In what she styles as an "Amended Response in Opposition to Defendants' Motion," Floyd disputes the propriety of WSSC's decision to hire Price. Floyd says Price did not follow proper procedures in applying for the Senior Manager Position as an external applicant. In particular, she says he submitted a resume for the job, but did not fill out WSSC's application. See Plf.'s Am. Resp. Opp'n 17-18, ECF No. 60; see also id., Ex. 3. As a preliminary matter, the Court need not consider these arguments, as they are contained in what is essentially a surreply memorandum which the Court did not authorize to be filed. Hall v. Prince George's Cty., 189 F. Supp. 2d 320, 321 n.1 (D. Md. 2002) (citing Local Rule 105.2(a)). But, even entertaining the new assertions by Floyd, the Court concludes that they have little bearing on the reasons why she was not selected for an interview.

WSSC and her eventual termination. WSSC removed both cases to this Court on May 30, 2014. They were docketed as separate cases, Civ. No. PJM 14-1749 (Complaint I) and Civ. No. PJM 14-1751 (Complaint II).[11]

In Complaint I, which she originally styled as a "Class Action Complaint," Floyd brings claims against WSSC for Violation of Title VII of the Civil Rights Act of 1964, as amended (Count 1); Unlawful Employment Practices (Count 2); and what she fashions as "Race, Sex, and National Origin Based Employment Discrimination" (Count 3). Specifically, Floyd alleges that WSSC did not comply with its own Equal Employment Opportunity and Employee Right Policies. She also alleges that the Interview Panel discriminated against her in connection the Scoring Sheet used in its hiring process. In Complaint II, Floyd brings claims of retaliation against WSSC (Count 1) and wrongful termination (Count 2) against both individual Defendants. These claims are based largely on the same factual predicate present in Complaint I.

On March 27, 2015, WSSC filed a Motion for Order Denying Class Certification with respect to Complaint I. Civ. No. PJM 14-1749, ECF No. 28. On June 1, 2015, Floyd filed a Notice of Dismissal with respect to Complaint I. Civ. No. PJM 14-1749, ECF No. 35.

On July 21, 2015, the Court consolidated Floyd's lawsuits (hereinafter, the "Consolidated Complaints"), designating Civ. No. PJM 14-1749 as the Lead Case. ECF No. 42. Since Complaint I included not only purported class allegations but also Floyd's individual claims, the Court allowed the individual claims in Complaint I to proceed. *Id.*

Now before the Court is Defendants' Motion for Summary Judgment as to all claims in the Consolidated Complaints. ECF No. 56.

---

[11] On June 4, 2014, Floyd filed Motions to Remand both Complaints. Civ. No. PJM 14-1749, ECF No. 8; Civ. No. PJM 14-1751, ECF No. 10. In a Memorandum Opinion and Order dated January 21, 2015, the Court denied the Motions to Remand. Civ. No. PJM 14-1749, ECF Nos. 22 and 23; Civ. No. PJM 14-1751, ECF Nos. 25 and 26.

## II.

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean, however, that "*some* alleged factual dispute between the parties" defeats the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). Further, "[a] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (internal quotation and citation omitted). The court may thus grant the motion when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Anderson*, 477 U.S. at 247 (quoting Fed. R. Civ. P. 56(c)).

Further, "[a]lthough *pro se* litigants are to be given some latitude, the above standards apply to everyone. Thus, as courts have recognized repeatedly, even a *pro se* party may not avoid summary judgment by relying on bald assertions and speculative arguments." *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011) (citing cases).

## III.

The Court addresses the Defendants' Motion with respect to all of Floyd's claims in the Consolidated Complaints.

**A.  *Retaliation Claim*[12]**

In support of her claim for retaliation, Floyd contends that WSSC retaliated against her when she was not afforded an interview for the new Senior Manager Position and, as a result, not hired for the Senior Manager Position. In particular, she alleges that she was retaliated against because of her prior EEOC and internal EEO Complaints, and says that WSSC used the "Scoring Sheet" to assign points arbitrarily and thereby discriminated against her. Compl. II 3:10-5:17; *see also* Plf.'s Resp. Opp'n, Mem. Supp. 9-10, 14-15. In moving for summary judgment, WSSC contends that Floyd cannot make out a prima facie case of retaliation, and even if she could, she cannot rebut WSSC's legitimate, non-discriminatory reasons for not interviewing and hiring her for the position. Defs.' Mot. Summ. J., Mem. Supp. 7-12.

Title VII prohibits an employer from "retaliating against an employee for complaining about prior discrimination or retaliation." *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (citing 42 U.S.C. § 2000e-3(a)). A plaintiff may prove retaliation either "through direct or indirect evidence of retaliatory animus, or through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Foster*, 787 F.3d at 249. As Floyd has proffered no direct or indirect evidence of retaliatory animus (nor does she purport to do so in her pleadings), she must therefore proceed under the *McDonnell Douglas* framework.

"The *McDonnell Douglas* framework is a three-step burden-shifting framework." *Foster*, 787 F.3d at 250. First, a plaintiff alleging retaliation must make out a prima facie case of retaliation. *Id.* "To establish a prima facie case of retaliation, a plaintiff must show that she: (1)

---

[12] Floyd's "Retaliation" claim is alleged in Count 1 of Complaint II. In Complaint I, she also alleges a Count styled as "Unlawful Employment Practices." In her deposition testimony, she clarified that the "Unlawful Employment Practices" claim is the same as her claim for retaliation in Complaint II. *See* Defs.' Mot. Summ. J., Ex. 22 at 159:10-160:15. The Court therefore addresses both claims together.

engaged in a protected activity; (2) the employer acted adversely against her; and (3) the protected activity and the adverse action were causally connected." *Lewis v. Baltimore City Bd. of Sch. Commissioners*, -- F. Supp. 3d --, No. CCB-14-3363, 2016 WL 2939695, at *4 (D. Md. May 20, 2016) (citing *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)). Next, if a plaintiff makes out this prima facie case, the burden shifts to the employer "to show that its purportedly retaliatory action was in fact the result of a legitimate, non-retaliatory reason." *Foster*, 787 F.3d at 250. Finally, if the employer makes this showing, the burden shifts back again to the "plaintiff to demonstrate that the employer's purported non-retaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Lewis*, 2016 WL 2939695, at *4 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004)).

Applying the *McDonnell Douglas* framework to the undisputed facts, Floyd's retaliation claim fails as a matter of law for two reasons.

*First*, Floyd cannot make out a prima facie case of retaliation.

WSSC does not dispute that Floyd engaged in protected activity when she filed her prior EEOC and EEO Complaints, nor does it dispute that Floyd was subjected to an adverse employment action when WSSC decided not to interview or hire her for the Senior Manager Position. Defs.' Mot. Summ. J., Mem. Supp. 8. Rather, WSSC contends that Floyd cannot show that WSSC's decision *not* to interview or hire her was causally connected to her prior EEOC and EEO activity, the third element of a prima facie case. *Id.* The Court agrees with WSSC.

"To satisfy the third element [of a prima facie case of retaliation], the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). In order to assess causation at the prima facie stage of a retaliation claim,

"courts often consider: (1) whether the allegedly retaliatory actor was aware that the plaintiff had engaged in the protected activity at the time of the allegedly retaliatory act, and (2) the temporal proximity between the protected activity and the allegedly retaliatory act." *Lewis*, 2016 WL 2939695, at *5 (citing *Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006); *Dowe*, 145 F.3d at 657)).

Assuming that the Interview Panel had knowledge of her protected activity,[13] Floyd's primary evidence of causation is that the Interview Panel made its decision not to extend her an interview *after* she had filed EEOC and Internal EEO Complaints.[14] Yet a serious deficiency in Floyd's prima facie case is the lengthy time interval between Floyd's EEO Complaints and the retaliatory actions at issue. "In order for temporal proximity alone to satisfy the causation prong of the prima facie case, the temporal proximity must be *very close*." *Lewis*, 2016 WL 2939695,

---

[13] In their briefings, the parties do not address whether any of the individuals on the Interview Panel actually knew about Floyd's prior EEOC and EEO activity. Simply averring that Coverstone and Shaw were the subjects of her prior discrimination Complaints, as Floyd does repeatedly in her Opposition, does not establish that these two individuals were aware of the protected activity when evaluating her application for Senior Manager Position. *See Lewis*, 2016 WL 2939695, at *5. The Court observes, however, that Coverstone and Shaw were copied on the FPO's May 12, 2009 notice to Floyd that the FPO found Floyd's discrimination allegations to be unsupported. *See* Defs.' Mot. Summ. J., Ex. 9. It therefore appears to be the case that Coverstone and Shaw were likely aware of Floyd's Internal EEO activity. There is no evidence in the record, however, that the third member of the Interview Panel – Wilkerson – actually knew of the EEO Complaints, which is another serious deficiency in Floyd's prima facie case. *See Baqir*, 434 F.3d at 748 (concluding that, because the plaintiff "has not pointed to any evidence that [his employer] knew . . . that he had been in contact with the EEO Counselor," he could not "establish retaliatory motive").

[14] Floyd points to a few other "facts" in support of her prima facie case, but none of these are evidence of causation. Emphasizing that her EEO Complaints were directed at Coverstone and Shaw and that these two individuals were on the Interview Panel, Floyd suggests that Coverstone and Shaw must have had a retaliatory motive when evaluating her Senior Management Position application. Plf.'s Resp. Opp'n, Mem. Supp. 14-15, 17. This contention, however, is unsupported by any evidence in the record and therefore creates no genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(c)(1)(A); *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (A "party cannot create a genuine issue of material fact through mere speculation or compilation of inferences."). Floyd also calls the Court's attention to another individual who was not interviewed for the Senior Manager Position, noting that this individual also previously filed an EEO Complaint against WSSC. Plf.'s Resp. Opp'n, Mem. Supp. 15. The Court, however, fails to see how another employee's protected activity and qualifications (or lack thereof) for the Senior Manager Position supports Floyd's claim of retaliation by WSSC against herself.

at *5 (citing *Allen v. Rumsfeld*, 273 F. Supp. 2d 695, 707 (D. Md. 2003)) (emphasis added). Floyd filed her first Charge of Discrimination with the EEOC on January 14, 2008.[15] Floyd then filed her Internal EEO Complaints on February 2, 2009 and February 12, 2009. The Interview Panel's decision not to extend Floyd an interview for the Senior Manager Position was made in or around July 2012 – nearly three-and-a-half years after Floyd filed her EEOC Complaint, and two-and-a-half years after Floyd filed her internal EEO Complaints. This substantial lag in time between Floyd's protected activity and the Interview Panel's hiring decisions is simply too long to establish causation as a matter of fact much less as a matter of law at the prima facie stage. *Lewis*, 2016 WL 2939695, at *5 ("A six month lag is sufficient to negate any inference of causation.") (quoting *Hooven-Lewis v. Caldera*, 249 F. 3d 259, 278 (4th Cir. 2001)); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action, as was the case here, negates any inference that a causal connection exists between the two.").

*Second*, even if Floyd could make out a prima facie case for retaliation, she cannot rebut WSSC's legitimate, non-discriminatory reasons for not interviewing or hiring her.

WSSC asserts that the Interview Panel used a Scoring Sheet in evaluating all applicants for the Senior Manager Position, that Floyd scored worse than most of the applicants on the Scoring Sheet because of her lack of experience in areas crucial to the position, and that Floyd's lack of necessary experience was the reason she was not extended an interview. Defs.' Mot. Summ. J., Mem. Supp. 10-12. The undisputed facts support these contentions.

---

[15] *See* text accompanying note 4, *supra*. Even assuming that the EEOC Complaint was filed in January of 2009, as Floyd contends, that date is still three and a half years before the Interview Panel declined to invite her for an interview in July 2012 – too lengthy a time interval to have any bearing on causation.

As noted, WSSC's "Scoring Sheet" contained specified categories to evaluate each applicant's background, skills, and expertise. A few of the Scoring Sheet categories assessed applicants' experience in specialized technology areas: "Large-scale systems acquisitions [experience]," "BPR & Systems Requirements [experience]," and "Enterprise systems/applications lifecycle [experience]." Floyd received zero out of ten points in two of these categories because she did not have the requisite experience. Accordingly, the Comments on the form used to score and evaluate her application stated: "Lack of experience on acquisition process and technology management experience." Largely as a result of her lack of experience in these key areas, Floyd scored lower than six out of the nine applicants. WSSC's Interview Panel therefore had ample reason not to extend her an interview. WSSC has satisfied its burden of providing a legitimate non-retaliatory reason for the allegedly retaliatory action.

Floyd counters that "there [was] no logic or justification behind how scores [were] assigned," that "there was no way to apply [the scores] in a consistent manner for each applicant," and that the system was "arbitrary." Plf.'s Resp. Opp'n 15. She thus argues that the Scoring Sheet was a pretext for discrimination. *See id.* But beyond these bald assertions of bias and arbitrariness, Floyd points to no relevant evidence in support her claims. She says that she had experience working with "Oracle Applications Suite" software – a category of relevant experience identified on the Scoring Sheet – but that the Interview Panel did not properly assign her points for that experience. *See id.* 17-18. While it is true that Floyd did not receive points on the Scoring Sheet for this category, despite having listed the experience on her resume, the effect of this on Floyd's overall score was minimal. Indeed, the "Oracle Applications Suite" category only accounted for five out of the sixty-five possible points. If Floyd had been awarded points for Oracle Application Suite experience, five other applicants would have still scored higher than

she. *See* Defs.' Mot. Summ. J., Ex. 13. For this reason, it is clear that the Interview Panel's failure to award Floyd points in this single category had no material effect on its decision not to interview her. This evidence does not demonstrate that the Scoring Sheet was a pretext for discrimination.

Floyd's other contentions of arbitrariness and bias with respect to the Scoring Sheet are at best speculative, as they are not supported by the record. Simply asserting that a particular system is rigged or that an Interview Panel member has retaliatory motives does not create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1)(A). In sum, the Court has no hard facts upon which to infer that WSSC's reasons for not interviewing Floyd were anything other than legitimate. *See DeJarnett v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[T]his Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination.") (internal citations and quotations omitted). Under the *McDonnell Douglas* framework, Floyd has failed to rebut WSSC's legitimate reason for not extending her interview, and she has failed to establish a dispute of material fact that retaliation was the but-for cause of the challenged adverse action. *See Lewis*, 2016 WL 2939695, at *6.

The Court will **GRANT** summary judgment in favor of WSSC with respect to Floyd's retaliation claim.[16]

## B.  *Wrongful Termination Claim*[17]

Floyd makes two conceptually distinct allegations in support of her claim of "wrongful termination" by Defendants. She alleges that she was wrongfully terminated because "WSSC did

---

[16] In Complaint II, Floyd only appears to allege retaliation against Defendant WSSC. However, to the extent Floyd also alleges a retaliation claim against Defendant Johnson, summary judgment is **GRANTED** in favor of Johnson for the reasons stated in this Part.

[17] Floyd's "Wrongful Termination" claim is alleged in Complaint II, Count 2.

not apply the same abolishment procedure used for Phase I merit employees with the Phase II merit employees and therefore wrongfully terminated her." Compl. II 14:17-19. She has also stated in deposition testimony that she believes she was treated differently during the One IT Plan of Reorganization in retaliation for her prior EEO activity. Defs.' Mot. Summ. J., Ex. 22, ECF No. 56-23. Defendants contend that both assertions fail as a matter of law. Defs.' Mot. Summ. J., Mem. Supp. 12-14.

The Court agrees with Defendants. It will address each of Floyd's allegations in turn.

### 1) *Defendants' Alleged Failure to Follow Proper Abolishment Procedure in Terminating Floyd under Maryland Law*

Under Maryland law, an employee may have a cause of action if terminated in violation of his or her employer's own job termination procedures and policies. *Suburban Hosp., Inc. v. Dwiggins*, 596 A.2d 1069, 1075 (Md. 1991). This is so even in the case of at-will employees.[18] *See id.* A cause of action for violation of employer policies is a corollary of a common law breach of contract claim. *See id.* ("If an employee is not afforded the job termination procedures outlined in a handbook, the employee may have a breach of contract action against the employer."). Thus, in order to prove the employer liable for failure to terminate according to employer policy, the employee must show that the "policy directives" at issue constituted "contractual obligations." *Id.* (citing *Dahl v. Brunswick Corp.*, 356 A.2d 221, 224 (Md. 1976)). "[E]mployer policy directives regarding aspects of the employment relation become contractual

---

[18] It appears to be undisputed that Floyd qualified as a "merit" employee when she worked as a Business Technology Analyst ("BTA") for WSSC. Nevertheless, the Court is unable to decipher what this status means in terms of Floyd's "at-will" standing. Floyd's offer of employment from WSSC is ambiguous with respect to this issue. *See* Defs.' Mot. Summ. J., Ex. 5. But inasmuch as Floyd's potential status as an "at-will" employee does not bear on the viability of Floyd's wrongful termination claims, as explained in this Part, *infra*, any dispute of fact with respect to this issue is immaterial for purposes of summary judgment.

obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Suburban Hosp.*, 596 A.2d at 1075 (internal citations and quotations omitted).

Assuming (without deciding) that Floyd can prove that WSSC's abolishment policy constituted a contractual obligation, her claims of wrongful termination under this theory nonetheless fail as a matter of law.

At all relevant times WSSC had an abolishment policy which set forth certain procedures for the Commission to follow. The policy provided:

> Providing steady employment for employees is a major concern of the Commission. However, actions such as reorganization, automation, restructuring, etc., may necessitate the abolishment of certain positions or a reduction in the number of staff assigned to certain classifications. Employees who are displaced as a result of position abolition or reduction in staff shall be afforded severance pay, an opportunity to continue certain benefits, and an opportunity to be considered for openings available at the time of displacement.

Defs.' Mot. Summ. J., Ex. 23, ECF No. 56-24. The policy also set forth certain procedures for the abolishment of positions, including the following requirements: (1) a staff officer must provide documentation to WSSC's General Manager regarding the nature, scope, and effective date of the action, (2) affected employees must be notified of position abolishment in writing, and (3) affected employees must be placed on administrative leave with pay at the time of the displacement. *Id.*

WSSC terminated Floyd's BTA position (along with the positions of other BTAs) in compliance with its own abolishment policy. Mujib Lodhi, Chief Information Officer, provided the requisite information to Defendant Jerry Johnson, the General Manager and CEO of WSSC, about the Phase II reduction in staff, *see* Defs.' Mot. Summ. J., Ex. 10; Human Resources notified Floyd of the termination in writing, *see* Defs.' Mot. Summ. J., Ex. 20; and Floyd was

16

placed on administrative leave with severance pay until the time her position was terminated, *see id.*

Floyd attempts to resuscitate her claim by asserting that Phase II employees were treated differently than certain Phase I employees under the One IT Plan of Reorganization. In particular, she points to the "CAMO Group Merit Employees," whose positions were displaced in Phase I of the One IT Plan of Reorganization. Plf.'s Resp. Opp'n, Mem. Supp. 19. Floyd says that the "CAMO Group" employees were not terminated, but rather given positions in other departments or given contracts to work in the Information Technology Department without having to apply for these positions. *Id.* Floyd's argument, however, is misguided: there is no provision in WSSC's abolishment policy which requires that all employees or groups of employees be treated the same during a reorganization and reduction in staff.

For these reasons, summary judgment is **GRANTED** to Defendants with respect to Floyd's wrongful termination claim premised on WSSC's abolishment policy procedures.

### 2)  *WSSC's Alleged Retaliation in Deciding to Terminate Floyd under Maryland Law*

A claim of wrongful termination involving allegations of employer retaliation may be cognizable in Maryland under the tort of abusive discharge.[19] *See Adler v. Am. Standard Corp.*, 432 A.2d 464, 471 (Md. 1981). An employee must demonstrate the following to state a claim for abusive discharge: "(1) that the employee was discharged; (2) that the dismissal violated some clear mandate of public policy; and (3) that there is a nexus between the defendant and the decision to fire the employee." *Shapiro v. Massengill*, 661 A.2d 202, 213 (Md. App. 1995).

The Maryland Court of Appeals has held that the tort of abusive discharge will lie when an employer discharges an employee for exercising a statutory right or privilege. *See Makovi v.*

---

[19] Abusive discharge is actionable as a tort notwithstanding an employee's at-will status. *See Adler v. Am. Standard Corp.*, 432 A.2d 464, 471 (1981); *see also* text accompanying note 18, *infra*.

*Sherwin-Williams Co.*, 561 A.2d 179, 182 (Md. 1989). The general rule, however, is that this tort is not actionable when the plaintiff exercises a right under a statute which itself provides a remedy against the violation. *Chappell v. S. Maryland Hosp., Inc.*, 578 A.2d 766, 770 (1990). Accordingly, this rule would likely bar Floyd's claims here, as they are in large part premised on her protected activity under Title VII (a remedial statute).[20] *See id.*

But even if Floyd could state a claim on the basis of her EEO activity, Floyd's wrongful discharge claim would still clearly fail as a matter of law, because there is no causal nexus between her protected activity and the abolishment of her position. Floyd's position was terminated in Phase II of the One IT Plan of Reorganization. She was terminated, in other words, as a result her employer's reduction in staff. Moreover, her termination was not unique to her— all other BTAs who did not successfully obtain a replacement position were involuntarily terminated. Floyd's argument of wrongful termination suggests that WSSC chose to abolish *all* BTA positions, including individuals who had nothing to do with Floyd or her discrimination claims, simply because *Floyd* was a BTA and had complained about the conduct of several of her managers. This contention is not only unsubstantiated and unsupported by any materials in the record, *see* Fed. R. Civ. P. 56(c)(1)(A), it is utterly implausible.

Summary judgment will therefore be **GRANTED** in favor of Defendants with respect to Floyd's wrongful termination claim premised on retaliation.

---

[20] The case law on this issue is nuanced. *See Higgins v. Food Lion, Inc.*, No. CIV. A. AW00CV2617, 2001 WL 77696, at *5 (D. Md. Jan. 23, 2001) (providing an overview of the Maryland case law). As the Court has a clear basis for granting summary judgment to Defendants without making a definitive ruling on this issue, it will decline to do so here.

*C.  Violation of Title VII and Race, Sex, and National Origin Discrimination Claims*

In her Consolidated Complaints, Floyd alleges what she styles as a "Violation of Title VII" claim[21] and a "Race, Sex, and National Origin Discrimination" claim.[22] She has conceded that she is no longer pursuing these claims. *See* Defs.' Mot. Summ. J., Ex. 22 at 158:9-159:9; Plf.'s Resp. Opp'n, Mem. Supp. 9 (excluding these claims from the "Counts" which "remain" in her suit); *see also generally id.* (not opposing Defendants' Motion for Summary Judgment with respect to these claims). Summary judgment on these two claims is therefore **GRANTED** in favor of Defendants.

## IV.

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 56) is **GRANTED** in favor of Defendants and against Floyd with respect to all claims in the Consolidated Complaints and the case will be **CLOSED**.

A separate Order will **ISSUE**.

_____
/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**August 19, 2016**

---

[21] Floyd's "Violation of Title VII" claim is alleged in Complaint I, Count 1.
[22] Floyd's "Race, Sex, and National Origin Discrimination" claim is alleged in Complaint I, Count 3.